# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

DEBORAH J. PARKMAN,

    Plaintiff,

v.

MANPOWER, INCORPORATED OF SOUTHERN NEVADA,

    Defendant.

Case No. 2:08-cv-01195-LDG (GWF)

**ORDER**

Defendant Manpower Incorporated of Southern Nevada (Manpower) hired plaintiff Deborah Parkman, an African-American, on September 6, 2006, as a Business Development Manager. Manpower terminated Parkman on February 2, 2007. Parkman brought this suit, alleging she was terminated because of her race and in retaliation for complaining about discriminatory conduct. Manpower moves for summary judgment (#26), arguing that it terminated Parkman based upon her work performance. Parkman opposes (#29). Having considered the arguments and the record, the Court will grant summary judgment in favor of Manpower.

Motion for Summary Judgment

In considering a motion for summary judgment, the court performs "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To succeed on a motion for summary judgment, the moving party must show (1) the lack of a genuine issue of any material fact, and (2) that the court may grant judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one required to prove a basic element of a claim. *Anderson,* 477 U.S. at 248. The failure to show a fact essential to one element, however, "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. As such, when the non-moving party bears the initial burden of proving, at trial, the claim or defense that the motion for summary judgment places in issue, the moving party can meet its initial burden on summary judgment "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Conversely, when the burden of proof at trial rests on the party moving for summary judgment, then in moving for summary judgment the party must establish each element of its case.

Once the moving party meets its initial burden on summary judgment, the non-moving party must submit facts showing a genuine issue of material fact. Fed. R. Civ. Pro. 56(e). As summary judgment allows a court "to isolate and dispose of factually unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the evidence before it "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). The allegations or denials of a pleading, however, will not defeat a well-founded motion. Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

To survive summary judgment, Parkman has the burden of offering "evidence that 'give[s] rise to an inference of unlawful discrimination,' either through the framework set forth in *McDonell Douglas Corp. v. Green*[, 411 U.S. 792 (1973),] or with direct or circumstantial evidence of discriminatory intent." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2001) (quoting *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (footnotes omitted). Under the *McDonnell Douglas* framework, Parkman has the initial burden of establishing that (1) she belongs to a protected class, (2) she was performing her duties according to Manpower's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly qualified persons were treated more favorably. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998). If the plaintiff meets this initial *McDonnell Douglas* burden, he raises a presumption of unlawful discrimination and shifts to the defendants the burden to articulate a legitimate reason for the adverse decision. If the defendants meet this burden, the presumption of discrimination disappears and the plaintiff has the burden of showing that the employer's stated reason is pretextual or not worthy of credence. *Hicks*, 509 U.S. at 510. "To show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Vasquez,* 349 F.3d at 642. Parkman may also survive a summary judgment motion by presenting "evidence, which if

3

believed, proves the fact [of discriminatory animus] without inference or presumption.'" *Id.*, at 640 (quoting *Godwin*, 150 F.3d at 1221 (alteration in original)).

To make out a prima facie case of retaliation under Title VII, Parkman must establish that: (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action. *See Manatt v. Bank of America, NA*, 339 F.3d 792, 800 (9th Cir. 2003).

"The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for" an adverse employment action. *Burdine,* 450 U.S. at 253-54. An employee's failure to perform work satisfactorily is among the "most common nondiscriminatory reasons" resulting in an adverse action. Though Parkman's burden in opposing summary judgment is not high, *see Pottenger v. Potlanch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003), she bears the ultimate burden of persuasion.

The parties' arguments reveal that, as to the *McDonnell Douglas* framework for establishing a prima facie case of discrimination, the only issue in dispute is Parkman's work performance. Manpower has established that it had developed minimum performance and sales expectations for Parkman's position in business development, and that Parkman did not meet these expectations. For the first two months that an employee is in the position, Manpower does not expect any minimum revenue. While Parkman did not produce any revenue in her first month, she produced revenues of $1,604 in the second month. By the third month of her employment as a business development manager, Parkman was expected to produce minimum revenues of $8,334, but produced $7,652. By her fourth month of employment, Manpower expected Parkman (and all business development managers) to produce minimum revenues of $33,334, but she produced only $8,107. By the fifth month of employment, Manpower expected Parkman (and all business development managers) to produce minimum revenues of $58,334, but she produced only $13,750. Manpower similarly established expected minimum gross

4

profits. Again, no expectations were set for the first two months of employment. For the third month of employment, Manpower expected its business development managers to have a minimum gross profit of $1,584. Parkman fell short of this expectation, having an actual gross profit of $271.31. By the fourth month of employment, Manpower expected its business development managers to have a minimum gross profit of $6,334. Parkman did not reach this minimum, having an actual gross profit of $2,022.55. By the fifth month of employment, Manpower expected a minimum gross profit of $11,084. Parkman achieved an actual gross profit of $2,625.89.

Both of Parkman's supervisors have submitted affidavits, supported in part by e-mails, asserting that through the months of December and January, they engaged in increasing efforts to assist Parkman in improving her sales activity, her revenue, and her gross profits, as well as to assist Parkman in using Manpower's computer systems.

In opposition, Parkman does not dispute or offer any evidence that her sales activities, revenues, and gross profits fell below Manpower's expectations for a business development manager for the third, fourth and fifth months of her employment. Rather, she argues that she passed her probationary period and did not receive any written or oral warnings or reprimands. She further notes that, immediately following her termination, one of her supervisors authored a recommendation letter for Parkman, in which he stated she has "terrific energy, tenacity, and closing ability. Debbie cold calls tirelessly and enjoys networking aggressively with good success."

While Parkman may have been qualified to be hired by Manpower as a business development manager, she has not shown that her performance in that position met Manpower's expectations. Rather, Manpower has shown that she did not meet those expectations. Accordingly, the Court finds that Parkman did not establish a prima facie case of discrimination under the *McDonnell Douglas* framework.

5

1  Although Parkman did not establish a prima facie case of discrimination under the
2  *McDonnell Douglas* framework, she can nevertheless survive summary judgment by
3  offering direct or circumstantial evidence of discriminatory intent that permits an inference
4  that her termination was the result of unlawful discrimination.  Parkman relies upon three
5  separate incidents.  In the first incident (which occurred at some undetermined time prior to
6  Parkman's employment), Elaine Karl (who would become one of Parkman's supervisors)
7  stated to Parkman's predecessor (who was also an African-American woman) that "black
8  people or females in particular were like bulldogs, the way we work, so go out and get
9  them."

10  In the second incident, during a late October meeting between Karl and Parkman, in
11  discussing Parkman's sales tactics, Karl stated, "I want you to be the Pure White Guardian
12  angel."  According to Karl, and undisputed by Parkman, Karl made the statement in
13  reference to Parkman coming to the rescue of customers, saving the day, allowing Karl and
14  the support staff to deal with problems or issues that are in any way negative."  Parkman
15  immediately reported Karl's "white guardian angel" comment to Dan Ward during a phone
16  call early on October 30.  Ward promptly instructed Karl that Parkman had reported the
17  comment, and that "black people will also be offended when you tell them you're going to
18  make them better by teaching them to be white."  Ward subsequently met and discussed
19  the incident with Karl in person, during which he "didn't back down from [his] position that it
20  was the wrong thing to say."  Parkman noticed that, for a few mornings after she made her
21  complaint, Karl would not speak to her in the mornings when Parkman came in and said
22  "Good morning" to everyone.  Parkman also stated, in the same document in which she
23  recounts these events, that after talking with Ward, Parkman informed him that she "would
24  try and stay away from Manager Karl."

25  The third incident occurred during a party held at Ward's house on November 11,
26  2006.  Everyone was drinking.  Ward (whom Parkman described as being a little wasted)

6

stated to his wife in front of Parkman: "Let me tell you what Elaine said to Debbie.  She wants her to be her White Guardian Angel."  Parkman was upset that Ward thought Karl's comment was funny, and told Ward.  The following day Ward apologized to Parkman for making fun of Karl's comment at the party.

At her deposition, Parkman testified that there were not any other comments made by anybody at Manpower that she considered to be racially offensive.

Accepting Parkman's characterization of Karl's statements as indicating that Karl "feels that African-Americans are too aggressive and need to be softer and less aggressive, like 'white angels,'"[1] the Court cannot conclude that the remarks constitute anything greater than stray remarks that do not raise an inference that her termination, three months after the "white guardian angel" comment was made, was motivated by a discriminatory animus.  Parkman concedes that no other racial comments were made.  While Parkman asserts that Karl did not acknowledge her for several days after the comment was reported to Ward, Parkman also asserts that she informed Ward that she would try and stay away from Karl.  Parkman did not offer any evidence of any racially-inappropriate statements or conduct by any person at Manpower subsequent to the "white guardian angel" comments.

By contrast, the record establishes that Parkman's work performance was sub-standard, and she received assistance from Karl and Ward in an effort to improve that performance.  Parkman's performance remained sub-standard until the date of her termination.  Accordingly, the Court finds that Parkman has not raised an inference, by direct or circumstantial evidence, that her termination was discriminatory.

---

[1] The Court notes that while Parkman states "being called a white angel is not in itself a derogatory reference," she argues that "telling a black person they need to be white certainly can be."  According to Parkman's own statement, however, Karl did not state that she wanted Parkman to be white.  Rather, according to Parkman, Karl stated she wanted Parkman "to be the Pure White Guardian angel."

7

For similar reasons, the Court cannot conclude that Parkman has raised an issue of fact that her termination was in retaliation for reporting Karl's comment to Ward. The record establishes that Ward responded immediately, taking a position that the comment was not appropriate, and that he repeated this position several times. While Karl and Parkman may have ceased speaking to each other for a few days, even Parkman's evidence does not suggest that this lasted longer than for several mornings. By contrast, through December and January, Karl and Ward worked with Parkman to assist her in improving her sales activity, her revenues, and her gross profits. Manpower even provided additional assistance to Parkman regarding Manpower's computer systems. The Court cannot conclude, from this evidence, that Parkman has raised an inference that she was terminated in February because, in October, she complained to Ward that Karl stated to her, during a meeting regarding Parkman's sales tactics, that she should become a "white guardian angel" to her customers.

Therefore, for good cause shown,

THE COURT **ORDERS** that Defendant's Motion for Summary Judgment (#26) is GRANTED.

DATED this ___18___ day of March, 2011.

_____
Lloyd D. George
United States District Judge